STATE OF MINNESOTA

IN SUPREME COURT

A14-0427

Dakota County                                                          Gildea, C.J.

State of Minnesota,

          Respondent,

vs.                                                          Filed:  June 24, 2015
                                                      Office of Appellate Courts
Roger Earl Holland,

          Appellant.

_____


Lori Swanson, Attorney General, Saint Paul, Minnesota; and

James C. Backstrom, Dakota County Attorney, Phillip D. Prokopowicz, Chief Deputy Dakota County Attorney, Hastings, Minnesota, for respondent.

Cathryn Middlebrook, Chief Appellate Public Defender, Charles F. Clippert, Special Assistant State Public Defender, Saint Paul, Minnesota, for appellant.
_____


S Y L L A B U S

1.     Because it was immediately apparent to police who saw text messages on appellant's cell phone that the text messages might provide evidence of a crime, the district court did not err in concluding that police properly seized appellant's phone pursuant to the plain-view exception.

1

2.     Because the search warrants were supported by probable cause, the district court did not err in denying appellant's motions to suppress evidence obtained from execution of the warrants.

3.     Because the district court examined the juror twice on the record, the juror gave inconsistent testimony in response to questions posed during voir dire, and the juror told court staff that she felt intimidated by the judge, it was not an abuse of discretion for the district court to strike the juror for cause without examining the juror a third time.

Affirmed.

O P I N I O N

GILDEA, Chief Justice.

Appellant Roger Earl Holland was convicted of two counts of first-degree murder for the deaths of Margorie Holland and her unborn child.[1]  On appeal, Holland raises three arguments.  First, Holland argues that the district court erred in admitting evidence from his cell phone, which he contends police illegally seized.  Second, Holland argues that the district court erred in admitting evidence obtained from the execution of numerous search warrants, because the warrant applications lacked probable cause.  Third, Holland argues that the district court improperly dismissed a juror for cause.  Because we conclude that police properly seized the cell phone under the plain-view

---

[1]     The jury also found Holland guilty of two counts of second-degree murder under Minn. Stat. § 609.19, subd. 1(1) (2014), but, consistent with Minn. Stat. § 609.035, subd. 1 (2014), he was not sentenced on those counts.

exception, the search warrants were supported by probable cause, and the district court did not abuse its discretion in dismissing the juror, we affirm Holland's conviction.

On March 7, 2013, Apple Valley police responded to a report of a pregnant woman in cardiac arrest. The caller, appellant Roger Earl Holland, told dispatch that the woman was unconscious, not breathing, and cold. Police were dispatched to an apartment and arrived at approximately 10 a.m. Police met Holland, who yelled, "She is in here, please help." Police found Margorie Holland ("Margorie") lying on her back at the bottom of a set of stairs inside the apartment.

Officers noticed several red scratches on the left side of Holland's face and neck. In statements to police, Holland said that Margorie had been suffering from abdominal cramps that morning and that he had rubbed her back to relieve the pain. Holland claimed that Margorie had sat in front of him and that during a cramping episode, she had accidentally scratched him. He said Margorie then told him she was hungry and he went to Taco Bell to get her food. On his way, he said, he received a text message from Margorie asking for McDonald's instead, so Holland said he went to McDonald's. Holland stated that when he returned home, he found Margorie face down on the floor, wrapped in a blanket, and nonresponsive. Holland said he rolled her over and started CPR before calling 911.

Police undertook resuscitation efforts until paramedics arrived. Police noticed that Margorie's hands were darker in color than the rest of her body, and that she had dried blood in both nostrils and on her upper lip and face. Margorie's pants were cut away as part of the life-saving efforts, and police noticed dark bruises on both knees and an

3

abrasion on Margorie's left knee. Margorie also had abrasions that appeared to be friction burns on both elbows and a bruise and scratch on one arm. Officers noticed small reddish-purple dots on Margorie's face that appeared to be petechiae.[2]

Officer Valerie Holes was one of the first police officers to arrive at the Hollands' apartment. She asked Holland about the text messages he said that he had received from Margorie so that she could determine how long Margorie had been unresponsive. As Holland tried to show Officer Holes the messages, his hand was shaking so badly that Officer Holes could not read the display on the phone. Officer Holes asked to see Holland's phone, and Holland gave his phone to the officer. Officer Holes testified that she did not intend to seize Holland's phone at that time but was trying to gain information that might be helpful for the paramedics. In looking at Holland's phone, Officer Holes saw that Margorie and Holland's phones had exchanged text messages that morning that were consistent with Holland's statements. Officer Holes told the other officers and paramedics that the last text message in the conversation was sent at 9:38 a.m.

Margorie was transported by ambulance to Fairview Ridges Hospital. After attempting life-saving measures, the emergency room doctor pronounced Margorie dead. Margorie's death also caused the death of her unborn child. As part of the examination of Margorie's body, the doctor noticed a faint abrasion or irritation on the front part of Margorie's neck, but the doctor did not see any obvious head injuries.

---

[2] Petechiae are "minute reddish or purplish spot[s] containing blood" that appear on skin. *Merriam-Webster Collegiate Dictionary* 866 (10th ed. 2001).

The medical examiner concluded that Margorie's manner of death was homicide, and the cause was strangulation. The medical examiner concluded that Margorie's injuries, including fractures to the horns of the thyroid cartilage in her neck and the petechiae on her face, were not consistent with a fall down the stairs.

Following an investigation, the State charged Holland with two counts of first-degree murder under Minn. Stat. §§ 609.185(a)(1); 609.2661(1) (2014) and two counts of second-degree murder under Minn. Stat. §§ 609.19, subd. 1(1); 609.2662(1) (2014) for Margorie's death and the death of her unborn child. On December 17, 2013, the jury found Holland guilty of two counts of first-degree murder and two counts of second-degree murder. The district court convicted Holland of two counts of first-degree murder and sentenced him to two consecutive life sentences without the possibility of parole. *See* Minn. Stat. §§ 609.185(a); 609.2661. This appeal follows.

I.

We turn first to Holland's contention that the district court erred in admitting evidence obtained from the search of his cell phone. Specifically, Holland argues that police seized his cell phone without a warrant and that the seizure therefore violated the federal and state constitutional prohibitions against unreasonable searches and seizures. *See* U.S. Const. amend. IV; Minn. Const. art. I, § 10. Because police illegally seized his cell phone, Holland argues, the evidence obtained from the subsequent search of the phone must be suppressed as fruit of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963) (stating that the exclusionary rule prohibits the use of evidence that has been "come at by exploitation of [an] illegality" (citation omitted)

(internal quotation marks omitted)).  The State concedes that police seized Holland's cell phone, but advances three exceptions to the warrant requirement to argue that the warrantless seizure was lawful: the plain-view exception, consent, and the inevitable discovery doctrine.  Before addressing these arguments, we begin with a discussion of the facts surrounding the seizure of Holland's cell phone.

Holland moved to suppress the evidence obtained from his cell phone before trial.  The district court conducted an evidentiary hearing at which the State offered testimony from Officer Holes and Detective Sean McKnight.

Officer Holes testified regarding her conversation with Holland, recounted above, and the text messages between Holland and Margorie that she saw.  Officer Holes said that the messages were consistent with Holland's description of his activity that morning and related to his trip to "get food for Mar[g]orie, and . . . where the food was going to come from."  After telling the other officers and paramedics that the last message was sent at 9:38 a.m., Officer Holes handed Holland's cell phone to Detective McKnight.

Detective McKnight said he came to the scene because of the suspicious nature of Margorie's death.  He testified that, after observing the scene, he believed that Margorie's time of death might have been earlier than Holland's statements indicated based on the appearance and condition of her body.  Specifically, Detective McKnight testified that, based on his training and experience and the condition of her body, he thought Margorie had been dead longer than 30 minutes.  He explained that "the coloration" of Margorie's body was not consistent with "a Caucasian woman who was recently deceased."  Detective McKnight also observed "injuries" on Margorie's body that, based on his

training and experience, he did not think she had suffered within 30 minutes of police arriving on the scene. Because of the condition and appearance of her body, Detective McKnight explained "that the time line didn't work that I had initially been told," and that "further investigation would be needed into" Margorie's death. Detective McKnight also noted that "Holland had scratches on him, . . . which he said came from Marjorie Holland, which means that there was some type of altercation or something that went on between them." And Detective McKnight noted that the position of Margorie's body did not "really work for falling down the stairs because of where she was." Detective McKnight said that he believed a crime had been committed based on what he observed and heard at the scene, "an assault at a minimum, homicide at the most."

When Officer Holes gave Holland's cell phone to Detective McKnight, Detective McKnight explained that he put the phone in airplane mode to prevent it from sending or receiving data, and placed it in his pocket until he could obtain a search warrant. Detective McKnight found Margorie's phone on the ground near where she had been found and he also put her phone in airplane mode and into his pocket.[3]

---

[3] Detective McKnight testified that he secured Holland's cell phone because he "need[ed] to make sure that nothing is altered here until I can get a search warrant," and that his "mindset was the same as freezing a scene on a house." The U.S. Supreme Court has upheld temporary seizures when needed to preserve evidence until police are able to obtain a warrant. *See, e.g.*, *Illinois v. McArthur*, 531 U.S. 326, 331-32 (2001); *Segura v. United States*, 468 U.S. 796, 811 (1984); *United States v. Place*, 462 U.S. 696, 701 (1983); *see also Riley v. California*, ___ U.S. ___, ___, 134 S. Ct. 2473, 2487-88 (2014) (noting that these principles are applicable to the seizure of cell phones). Our precedent is in accord. *State v. Moffatt*, 450 N.W.2d 116, 120 (Minn. 1990). The State does not advance the temporary seizure rule discussed in these cases as a basis to uphold police

(Footnote continued on next page.)

Subsequently, Officer Holes and Holland were on the way to the hospital together, and Holland stated that he wanted to contact Margorie's family and needed some phone numbers from his phone. Officer Holes received Holland's permission for Detective McKnight to get the numbers from Holland's phone and Detective McKnight gave Officer Holes the information. Other than a review of the text messages offered by Holland at the scene and the retrieval of Margorie's family's phone numbers, police did not obtain any information from Holland's phone before obtaining a search warrant. After obtaining the warrant, police recovered data, including additional text messages and searches made over the internet from Holland's phone. Holland contends that all of this information should have been suppressed as the fruit of the illegal seizure of his cell phone.

The State argues that the seizure was lawful based on the plain-view exception. Under the plain-view exception to the warrant requirement, police may seize an object without a warrant if three criteria are met. *State v. Milton*, 821 N.W.2d 789, 799 (Minn. 2012). First, the police must be lawfully in the position from which they have a view of the object. *Id.* Second, the officer must have a lawful right of access to the object. *Id.* And finally, the object's incriminating nature must be "immediately apparent." *Id.* (quoting *State v. Zanter*, 535 N.W.2d 624, 631 (Minn. 1995)). Holland does not dispute that the first two requirements are met in this case, but argues that the district court erred

_____

(Footnote continued from previous page.)
action relative to Holland's cell phone. Accordingly, we express no opinion on the applicability of this rule to the circumstances presented here.

in determining that the incriminating nature of the cell phone was immediately apparent, because the officers did not have probable cause to believe that Holland's cell phone contained incriminating evidence. Specifically, Holland faults the district court for concluding that the seizure was justified under the plain view exception because the police had only a "reasonable basis" to believe that a crime had been committed when they seized his cell phone. Holland notes that the standard is not reasonableness, but probable cause, and he contends that in seizing Holland's phone, Detective McKnight acted on mere suspicion.

We agree with Holland that police must have probable cause to believe the item seized is of an incriminating nature in order to support a warrantless seizure under the plain-view exception. *See Zanter*, 535 N.W.2d at 631-32 ("A reasonable suspicion on the part of police is insufficient to invoke the plain view exception."). But our review of the record establishes that police had probable cause.

Police have probable cause to seize an object in plain view if " 'the facts available to the officer would warrant a [person] of reasonable caution in the belief that certain items *may be* . . . useful as evidence of crime.' " *Id.* at 632 (emphasis added) (citation omitted). To justify a warrantless seizure under the plain-view exception, probable cause must be based on evidence "revealed in plain view" and cannot be obtained after conducting some further search of the object. *In re Welfare of G.M.*, 560 N.W.2d 687, 693 (Minn. 1997) (citation omitted) (internal quotation marks omitted). In other words, "the mere fact that the container itself is in plain view provides no basis for a warrantless seizure and search of it, even assuming probable cause as to the contents." *Id.* at 694

9

(quoting 1 Wayne R. Lafave, *Search and Seizure* § 2.2(a), at 401-02 (3d ed. 1996)). In this case, police did not conduct a further search of the phone. When Officer Holes and Detective McKnight looked at the phone, the text messages at issue were openly displayed on the cell phone screen; no further examination of the phone was necessary. Therefore if police had probable cause to believe the text messages may be evidence of a crime, the cell phone was properly seized under the plain-view exception.

The police here had probable cause to believe that the text messages they saw in plain view might be useful as evidence of a crime. The messages that described from where Holland would be purchasing food for his wife, viewed in isolation, do not evidence criminal activity. But the U.S. Supreme Court has recognized that in order to determine whether an object may be useful as evidence of a crime, the officer may consider background information that casts light on the nature of the object. *Texas v. Brown*, 460 U.S. 730, 741-43 (1983) (holding that an officer had probable cause to believe a balloon contained an illegal substance based on his experience in narcotics arrests and discussions with other officers); *see also Colorado v. Bannister*, 449 U.S. 1, 3-4 (1980) (upholding the seizure of items fitting the description of recently stolen property under the plain-view exception).

Our precedent likewise recognizes the validity of seizures under the plain-view exception when background information has illuminated the incriminating nature of an object. In *State v. Zanter*, for example, we upheld the seizure of several photographs during a murder investigation that on their face did not appear to be incriminating. 535 N.W.2d at 632. We concluded that the officer's background knowledge about the

10

murder, "when added to the facts observed during the search, would have led a reasonable police officer to conclude that the photographs were incriminating." *Id.*

Similarly, in *State v. DeWald*, the officer seized a package of unfiltered Camel cigarettes that did not, from its appearance alone, appear incriminating. 463 N.W.2d 741, 747 (Minn. 1990). We upheld the seizure under the plain-view exception because the officer knew that unfiltered Camel cigarettes had been observed at the scene of the crime, and therefore police had probable cause to believe the cigarettes provided a connection to the crime. *Id.* at 747-48; *see also Milton*, 821 N.W.2d at 801 (upholding the seizure of shell casings when the officer "had been sent to [the scene] because the police believed [the defendant] was a witness to a shooting homicide, which necessarily involved a gun and therefore most likely involved shell casings"); *State v. Streitz*, 258 N.W.2d 768, 773 (Minn. 1977) ("Although at the time the officers converged at [the location] they had no suspicions that they would find stolen property on the premises other than the speakers [for which they had a warrant], what they found on the premises combined with the background information . . . gave rise to a reasonable inference that they had stumbled upon stolen goods.").

We reach the same conclusion in this case. The text messages Holland showed to Officer Holes, if considered alone, may have been innocuous. But when the timing of the text messages was considered against the appearance and condition of Margorie's body, the potentially incriminating nature of the text messages displayed on Holland's cell phone was immediately apparent. As Detective McKnight said, the information police gathered at the scene was not consistent with Holland's statements and the timeline set

11

out in the text messages. Specifically, Detective McKnight testified that based on his training, experience, and observations of Margorie's body, he believed she had been dead much longer than the 20 to 25 minutes indicated by the text messages. Because the displayed text messages made it appear as though Margorie were alive when in fact she was already dead, it was reasonable for Detective McKnight to believe that the displayed text messages may have provided evidence that Margorie's death was the result of a crime and not an accident. Detective McKnight's knowledge of the scene, when added to his observation of the text messages, gave police probable cause to seize the phone under the plain-view exception.

In sum, because the incriminating nature of the text messages was immediately apparent, Detective McKnight properly seized Holland's cell phone pursuant to the plain-view exception.[4] We therefore hold that the district court did not err in denying Holland's motion to suppress evidence on the basis that police illegally seized Holland's phone.[5]

## II.

We turn next to Holland's contention that numerous search warrants lacked probable cause and relied on improper evidence, and therefore the district court erred in

---

[4] The police did what the U.S. Supreme Court instructed them to do in *Riley v. California*; they obtained a warrant before searching Holland's phone. *See* ___ U.S. ___, ___, 134 S. Ct. 2473, 2495 (2014).

[5] Because we conclude that police properly seized Holland's cell phone under the plain-view exception, we do not reach the State's alternative arguments that Holland consented to the seizure or that the cell phone evidence would have inevitably been discovered.

12

admitting evidence obtained from execution of these warrants. A warrant is supported by probable cause if, on the totality of the circumstances, there is a " 'fair probability that contraband or evidence of a crime will be found in a particular place.' " *State v. Fort*, 768 N.W.2d 335, 342 (Minn. 2009) (quoting *State v. Wiley*, 366 N.W.2d 265, 268 (Minn. 1985)). On review, we must "determine whether there was a substantial basis to conclude that probable cause existed." *State v. Bradford*, 618 N.W.2d 782, 794 (Minn. 2000). We consider "the type of crime, the nature of the items sought, the extent of the suspect's opportunity for concealment, and the normal inferences as to where the suspect would keep the items." *State v. Pierce*, 358 N.W.2d 672, 673 (Minn. 1984). Our inquiry is limited to the information presented in the affidavit supporting the warrant. *State v. Souto*, 578 N.W.2d 744, 747 (Minn. 1998). When reviewing a pretrial order on a motion to suppress, we review the district court's determination of probable cause de novo. *Milton*, 821 N.W.2d at 798.

The police obtained numerous search warrants during their investigation. From the first few searches, which included a search of Holland's and Margorie's cell phones and the surveillance video from the Hollands' apartment building, officers discovered evidence that disputed Holland's timeline from the morning of Margorie's death. Specifically, the message sent from Margorie's phone regarding breakfast from McDonald's was sent at 9:29 a.m., but police determined that Holland did not leave the apartment until 9:34 a.m. In addition, an examination of Holland's phone revealed that on March 6, the day before Margorie's death, someone entered the following text into

13

Holland's phone: "if you pass out and fall down a flight of stairs can you break your neckcan [sic] your neck be broken if you are."

The searches of the Hollands' phones also revealed that the couple was having financial trouble. Messages sent from Margorie's phone showed that Margorie did not trust Holland and was planning to leave him and to stay with her mother. The cell phones also contained evidence that the couple had discussed divorce.

Before trial, Holland moved to suppress evidence obtained pursuant to the multiple warrants. Holland argued that his and Margorie's cell phones had been illegally seized and that the subsequent search warrants relied on evidence obtained from the resulting illegal searches. Holland also generally argued that the affidavits submitted with the warrant applications did not establish probable cause. In response, the State argued that Holland did not have standing to challenge the seizure of Margorie's cell phone and, as discussed above, that the warrantless seizure of Holland's phone was lawful. The State also argued that the warrant applications established probable cause. The district court denied the motions to suppress and held that Holland lacked standing to challenge the seizure of Margorie's cell phone, that his phone had been properly seized, and that "the issuing magistrate had a substantial basis for concluding that probable cause existed to support the warrants issued." Holland argues that the district court erred in admitting evidence obtained from the execution of these warrants. We address the warrants at issue in turn.

## A.

Holland first challenges the warrants authorizing searches of his cell phone,[6] his apartment building's surveillance videos and key logs, his body, his apartment, both of his vehicles, and a variety of computer hardware and documents found in his apartment. Holland argues that these warrant applications lacked probable cause because "there was no honest and strong suspicion that a crime had been committed." We disagree.

Opportunity to commit a crime can support a finding of probable cause. For example, in *State v. Harris*, we concluded that an affidavit was sufficient to establish probable cause, in part because the defendant had been seen in the victim's apartment the night of the murder. 589 N.W.2d 782, 789 (Minn. 1999).

The affidavits here establish the suspicious nature of Margorie's death and that Holland had the opportunity to harm her. In addition to Holland's claims about leaving the apartment to get food for Margorie, the affidavits include observations from the officers at the scene about Holland's injuries, which were consistent with fingernail scratches, and Margorie's injuries, which did not appear to have resulted from a single fall down the stairs. Because the officers' observations of Margorie's body contradicted Holland's statements to police and the timing of the text messages police saw on Holland's cell phone, we conclude there was probable cause to believe evidence of a

---

[6]     Holland also argues that the warrant application did not state sufficient facts to establish probable cause for the search of Margorie's cell phone. But the district court held that Holland did not have standing to challenge a search of Margorie's phone. Holland does not contest that legal conclusion on appeal. Accordingly, we do not discuss further the search of Margorie's phone. *See Melina v. Chaplin*, 327 N.W.2d 19, 20 (Minn. 1982) (stating that an issue "not argued in the briefs" is forfeited).

15

crime would be found in searches of Holland's phone, body, apartment, vehicle, computer and documents, and the apartment building's surveillance and logs.

In addition to challenging the district court's findings of probable cause to support the warrants, Holland argues that the affidavit supporting the search of his computer hardware relied on improper evidence. The affidavit supporting the computer hardware warrant recounted the suspicious nature of Margorie's death and went on to list information found on Holland's and Margorie's phones, including that Holland and Margorie were having an "ongoing argument about money," that Margorie had researched how late into her pregnancy she could get an abortion, and that Holland had researched "can a person break their neck falling down the stairs." Because we conclude, as explained above, that police properly seized Holland's phone under the plain-view exception, and searched his phone pursuant to a valid search warrant, Holland's argument that the warrant to search his computer relied on improper evidence fails.

B.

Holland next challenges the warrants authorizing the searches of multiple other electronic devices. Police searched devices found in Holland's apartment and vehicles, including laptops, old cell phones, iPads, thumb drives, and hard drives. Holland argues that the warrants authorizing those searches lacked probable cause connecting Holland to Margorie's death or showing that the devices would contain evidence relevant to the crime.[7]

---

[7] The State argues that Holland lacks standing to challenge the warrants authorizing searches of an iPad, a computer, and an iPhone, because the devices belonged to Margorie and Holland lacks a reasonable expectation of privacy in the items. Because

(Footnote continued on next page.)

We conclude that these warrant applications established probable cause and contained sufficient information to create a nexus between the criminal activity and the devices. *See Souto*, 578 N.W.2d at 749 ("[T]here must be specific facts to establish a direct connection between the alleged criminal activity and the site to be searched."). The affidavits supporting the searches of the electronic devices established that a crime had been committed by describing Holland's 911 call, the medical examiner's report about Margorie's injuries, and the medical examiner's conclusion that Margorie's "death was caused by an assault by another human being." The affidavits connected Holland to the crime by noting police observations of his injuries and that evidence from the previously searched cell phones and video from the apartment complex contradicted Holland's statements to police. Finally, the affidavits connected the electronic devices to be searched to the crime, by stating that Holland admitted to searching the phrase "can you break your neck falling down the stairs" on his phone and iPad. Holland claimed he was researching whether such an injury was possible because Margorie had a dream about becoming paralyzed. The targeted devices could have contained documents or other search terms that would confirm or dispute Holland's statements about the research. We therefore conclude that there was a substantial basis to determine that probable cause existed and that the district court did not err in denying Holland's motion to suppress the evidence obtained from execution of these warrants.

---

(Footnote continued from previous page.)
we conclude the warrant applications established probable cause, we do not reach this argument.

17

## C.

Finally, Holland challenges warrants that authorized the searches of bank accounts and financial records. Holland argues that these warrants were issued without probable cause, relied on improper evidence from prior illegal searches, and contained no indication that reviewing the financial records of the couple would lead to evidence of a crime. The State responds that the applications established probable cause.[8] We agree with the State.

The affidavits supporting the search of Holland's financial records included information about the initial response to Holland's 911 call, Margorie's injuries, Holland's injuries, and the results of the autopsy. The affidavits also established concerns with Holland's credibility. The affidavits first stated that previous searches had revealed a timeline of events from the morning of March 7 that contradicted Holland's claims and that Holland had researched someone breaking his or her neck in a fall down the stairs. Then, the affidavits noted that prior searches had revealed text-message conversations between Margorie and Holland regarding financial problems, despite "statements made by [Holland] in which he painted their relationship as very good and without issues." Finally, the affidavits stated that Holland's rent check for the month had been returned for insufficient funds and that Holland's bank accounts were closed on

---

[8] The State also argues that Holland lacks standing to challenge searches of Margorie's bank accounts and financial records. Because we conclude that the applications established probable cause, we do not reach this argument.

March 6, the day before Margorie's death.[9] Based on the information in the affidavits, there was probable cause for the warrants to search Holland's financial records.

In sum, the challenged affidavits established probable cause and did not rely on improper evidence. We therefore hold that the district court did not err in denying Holland's motions to suppress.[10]

### III.

Finally, we turn to Holland's argument that the district court erred in dismissing a juror for cause. Jury selection began on November 19, 2013. During voir dire on November 22, 2013, a potential juror ("the juror") told the court that she had plans to travel to Australia on December 9, 2013. The juror said the ticket cost her $1,700, but that she would accept the loss on the ticket and continue to serve jury duty. The juror indicated that she would not hold it against the parties if she were unable to go on her

---

[9] The warrant authorizing the search of Holland's briefcase contained some additional information, including that police obtained the briefcase from Margorie's parents and that Margorie's parents suspected that Holland was committing check fraud. The application also noted that a preliminary review of the financial documents from other searches showed that Holland "was facing a great deal of debt." The State argues that a warrant for the briefcase was unnecessary because officers obtained it from private individuals, Margorie's parents. The Fourth Amendment constrains government searches, but not searches conducted by private individuals. *State v. Buswell*, 460 N.W.2d 614, 617 (Minn. 1990). Police obtained a valid warrant before searching the briefcase, however, and therefore the legality of a warrantless search is not before us in this case.

[10] In Holland's brief, he challenges the warrant authorizing a second search of his cell phone and a warrant authorizing the search of two Hotmail accounts. But the State did not offer any evidence obtained from execution of these warrants. Accordingly, it is not necessary for us to review whether these warrants were issued upon a showing of probable cause.

19

vacation. The judge asked whether the parties wanted to excuse her and the State made no objection to the juror being excused. Holland's attorney stated that he opposed a motion to excuse the juror for cause because the parties did not have sufficient information to make the motion. After questioning, both parties accepted the juror and she was selected as a juror on the case.

On November 27, 2013, the court questioned the juror again, after she contacted one of the jury managers because she was upset about an additional cost associated with her trip. The court conducted a hearing during which the juror was again examined on the record. The juror told the judge that she had determined how much it would cost to move her flight and that she could not afford it. Contrary to her earlier statements, the juror stated that if she served on the jury, she would be distracted by thoughts of her missed trip. After additional questions from the judge, however, the juror stated that missing the trip would not affect her ability to serve as a juror. Neither party objected to the juror staying on the jury, and the judge decided that she would remain on the case.

Later that same day, the juror went to the clerk's office and told court staff that she felt intimidated by the judge and the process. The staff person with whom the juror spoke told the judge that the juror was "very emotional" and "kind of a wreck." The juror indicated that she would contact the media about missing her trip to serve on the jury.

On a conference call with the attorneys that afternoon, the judge informed the attorneys about the juror's behavior based on the description the judge had received from court staff. The prosecutor then moved to strike the juror for cause due to questions

about her ability to be fair and impartial. The prosecutor noted that although the judge is neutral, "the judge is still in most people's eyes a representative of the state," and therefore the juror's feelings of intimidation concerned the prosecutor. Holland's attorneys asked the court to question the juror on the record again before making a decision. The judge declined to question the juror further and struck her for cause "from the standpoint of, if nothing else, emotional stability."

A court reporter transcribed the conference call, and the parties made a record of the motion to strike for cause the following Monday, December 2, 2013. The judge noted that he would normally honor Holland's request to bring the juror back for further questioning, but under the circumstances the court was concerned that she could taint other jurors while waiting to be called, and it was clear to the court that the juror did not have the stability to serve on the case. A previously chosen alternate replaced the juror and the jury was sworn later that day.

Holland argues that the district court erred because it dismissed the juror after the completion of voir dire, the dismissal did not meet the requirements for a dismissal for cause under Minn. R. Crim. P. 26.02, subd. 5(1)4, and the court relied on statements from court staff outside of the record. The State responds that the district court properly dismissed the juror pursuant to Minn. R. Crim. P. 26.02.

We begin with a review of the requirements of Minn. R. Crim. P. 26.02, subd. 5. We interpret procedural rules de novo. *State v. Barrett*, 694 N.W.2d 783, 785 (Minn. 2005).

21

Under Rule 26.02, a challenge for cause must generally be made "before the juror is sworn to try the case, but the court for good cause may permit it to be made after the juror is sworn but before all the jurors constituting the jury are sworn." Minn. R. Crim. P. 26.02, subd. 5(2). A party may challenge a juror for cause if the "juror's state of mind—in reference to the case or to either party—satisfies the court that the juror cannot try the case impartially and without prejudice to the substantial rights of the challenging party." *Id.*, subd. 5(1)1; *see also State v. Ames*, 91 Minn. 365, 372, 98 N.W. 190, 192 (1904) (holding that the district court properly allowed a challenge to a juror before the jury was complete because "[t]he cause shown was sufficient, the state had come into possession of new evidence bearing upon the juror's suitability, [and] the defendant was not prejudiced").

The district court dismissed the juror on November 27, 2013. The court swore the jury to try the case on December 2, 2013. The timing of the State's motion to strike the juror for cause, therefore, did not, as Holland argues, violate Minn. R. Crim. P. 26.02, subd. 5(2). In addition, the district court did not, as Holland suggests, cite Minn. R. Crim. P. 26.02, subd. 5(1)4, which allows a challenge based on a "physical or mental disability that renders the juror incapable of performing the duties of a juror," as the ground to strike the juror.

The district court's dismissal of the juror, however fits under another provision in Rule 26.02—subdivision 5(1)1, which provides that a juror may be challenged for cause if the "juror's state of mind—in reference to the case or to either party—satisfies the court that the juror cannot try the case impartially and without prejudice to the substantial

rights of the challenging party." Given the juror's inconsistent statements as to the impact her missed trip might have on her and her statement to court staff that she felt intimidated by the judge, a sentiment that the parties do not suggest was anything other than genuine in their briefs to this court, we hold that the district court did not abuse its discretion in granting the State's motion to strike the juror for cause under subdivision 5(1)1.

Finally, Holland argues that the district court erred in relying in part on the out-of-court statements of court staff to strike the juror.[11] Holland cites Minn. R. Crim. P. 26.02, subd. 4(1), which states, "A verbatim record of the voir dire examination must be made at any party's request." The district court did question the juror on the record on two separate occasions and the court noted that firsthand observations of the juror played a part in its decision to grant the State's motion. Holland is therefore incorrect when he argues that the "district court did not have an opportunity to observe [the juror's] demeanor and hear her testimony about her ability to serve as a juror." It might have been preferable for the court to examine the juror a third time on the record. But given the juror's conflicting statements and the concerns she raised with court staff about feeling intimidated by the judge, we hold that the court did not abuse its discretion in relying on the out-of-court statements from court staff.

Affirmed.

---

[11] Despite Holland's contention that the district court should not have relied on out-of-court statements, Holland did not request that the court staff who spoke with the juror testify on the record.

23